George VanLEEUWEN, Herbert C. Coleman, William A. Kessi, Ed Ammon, and Fred Kaser, Plaintiffs,

v.

The FARM CREDIT ADMINISTRATION; Donald J. Wilkinson; the Federal Intermediate Credit Bank of Spokane, Washington; Larry K. Butterfield; Twelfth Farm Credit District; and Ronald Bokma, Defendants.

Civ. No. 83–1413–PA.

United States District Court, D. Oregon.

Nov. 3, 1983.

William D. Brandt, D. Olcott Thompson, Ferder, Ogdahl & Brandt, Salem, Or., for plaintiffs.

Richard A. Edwards, James N. Westwood, Miller, Nash, Wiener, Hager & Carlsen, Portland, Or., for defendants Federal Intermediate Credit Bank, Larry K. Butterfield, Twelfth Farm Credit Dist., and Ronald Bokma.

Charles H. Turner, U.S. Atty., Jack G. Collins, Asst. U.S. Atty., Portland, Or.,

behind actual grade level assigned to govern-      ment attorney-applicant).

Frederick R. Medero, Gary L. Norton, Kathleen M. Mullarkey, Farm Credit Admin., Washington, D.C., for defendants Farm Credit Administration and Donald E. Wilkinson.

PANNER, District Judge.

Plaintiffs are five shareholders and former directors of the Willamette Production Credit Association ("Association"). Defendants are the Farm Credit Administration ("FCA") and its Governor, Donald J. Wilkinson, the Federal Intermediate Credit Bank of Spokane, Washington ("FICB") and its president, Larry K. Butterfield, and the Twelfth Farm Credit District and the chairman of its board, Ronald Bokma. Plaintiffs contend the FCA improperly devalued security on loans and charged off assets when performing a special audit of the Association's books. On October 5, 1983, I restrained defendants from appointing a receiver for the Association and commencing its liquidation. On October 26th I granted a preliminary injunction. *See* Appendix I, Order Granting Preliminary Injunction (Oct. 26, 1983). This opinion memorializes my decision. *See* Fed.R.Civ.P. 65(d). Defendants have moved for a stay of the preliminary injunction pending appeal to the U.S. Court of Appeals for the Ninth Circuit. I defer ruling on the motion to stay until the hearing on November 9, 1983. In addition, I AMEND the preliminary injunction.

## JURISDICTION

I previously determined this court has jurisdiction to review the actions of the FCA under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq. See* Appendix II, Opinion and Order Granting Temporary Restraining Order, op. at 266–267 (Oct. 12, 1983, *nunc pro tunc* Oct. 7, 1983). The FCA's action in attempting to appoint a receiver and commence liquidation is not committed to its discretion by law. *Id.*, op. at 266–267.

## STANDARDS

I previously outlined the Ninth Circuit standards for issuance of a preliminary injunction. *Id.*, op. at 267.

## BACKGROUND

The Farm Credit Administration is an independent executive agency comprised of the Federal Farm Credit Board, the Governor, and other personnel. 12 U.S.C. § 2241.[1] The FCA is mandated to charter, supervise, examine and regulate the banks and associations that comprise the Farm Credit System ("System"). The System is divided into twelve Farm Credit Districts, each of which contains a federal land bank, a federal intermediate credit bank, a bank for cooperatives, and varying numbers of local federal land bank associations, local banks for cooperatives, and production credit associations ("PCAs"). The Association is one of thirty PCAs in the Twelfth Farm Credit District. Those PCAs obtain funds from the FICB to finance operating and capital credit needs of eligible borrowers. The System banks and associations are owned by borrower-members and operated on a cooperative basis. Their function is to serve the credit needs of farmers, ranchers, and aquatic producers and harvesters.

The FICB and Association are both System institutions subject to supervision by the FCA. The FICB has two primary responsibilities. First, it sells notes and bonds in the nation's money markets, through the System's fiscal agent, and loans the proceeds to PCAs. The federal government is not liable on and does not guarantee System notes and bonds. Second, the FICB is responsible for the direct supervision of the PCAs. In this capacity, the FICB conducts reviews of PCA operations at least annually to evaluate compliance with applicable statutes, FCA regulations, policies of the district board, and good business practices. *See*

---

**1.** With one exception, the members of the Federal Farm Credit Board are appointed to six-year terms by the President, with the advice and consent of the Senate. 12 U.S.C. §§ 2242(a), (e). The Board appoints the Governor who serves at their pleasure. 12 U.S.C. § 2244.

*generally* H.R.Rep. No. 1287, 96th Cong., 2nd Sess. 15–17.

The FCA conducted a special audit of the Association as of June 30, 1983. The auditors reduced the values of underlying security on loans made by the Association. Based on the reduced values, they reclassified the loans and reduced loan values on the balance sheet. As a result of the charge-offs in asset values, the Governor of the FCA issued an order finding the capital stock of the Association impaired. FCA Order No. 846, August 10, 1983, 48 F.R. 39,291–92 (Aug. 30, 1983) ("Order"). The Order suspended the plaintiffs as directors of the Association and instituted other protective procedures pursuant to 12 C.F.R. § 611.1140 (the "1140 procedures"). Plaintiffs then brought this action. At the time I issued a temporary restraining order on October 5, 1983, the FCA had announced its intent to appoint a receiver and commence liquidation on October 7th. If the liquidation ultimately is allowed, it will be the first involuntary liquidation of a PCA in modern times as the result of a determination of stock impairment by an audit of the PCA's books.

The total capital stock of the Association on June 30, 1983 was $10,161,725. The Association's books showed its total net worth was $17,620,363. That figure was calculated by subtracting total liabilities of $98,145,547 from total assets of $115,765,-910. Net worth therefore exceeded capital stock by $7,458,638.

The FCA special audit, after the changes in values of securities and charge-off of loans, showed a total net worth of only $9,116,076. That figure was calculated by subtracting total liabilities of $98,145,547 from total assets of $107,261,623. The result was that the FCA special audit showed

the net worth to be $1,045,649 less than the capital stock, which the FCA contends is "stock impairment."[2] That finding was the basis for the FCA's invoking the protective procedures of 12 C.F.R. § 611.1140.

The reduction of net worth is also critical because it triggered a cut-off in funds from the FICB to the Association. Under 12 U.S.C. § 2074(c) and 12 C.F.R. § 614.5240, a federal intermediate credit bank cannot advance funds to a PCA whose debt exceeds its paid-in and unimpaired capital and surplus by a factor of more than ten times. Before the auditors changed the values and charged off assets, this "debt-to-capital" ratio was less than 10 to 1. After the audit, the $8.5 million charge-off reduced the surplus to below zero, *see* note 2, *supra*, and increased the Association's ratio of "debt-to-capital" to 10.8 to 1.[3]

The FCA's charge-off of assets from the Association's books has triggered the imminent collapse of an institution which has served Oregon's agriculturally-rich Willamette Valley for nearly half a century. Plaintiffs contend the FCA violated its own regulations and acted arbitrarily and capriciously in charging off the assets. They further contend that if the audit had been properly performed there would be no stock impairment and no excess debt-to-capital ratio.

## DISCUSSION

### I. *Introduction.*

At the outset, I need to carefully define the court's role in this action. It is not the function of a court to second-guess the values FCA examiners have placed on collateral securing the Association's loans, the classification of certain loans as "loss loans," or the determination of charge-off

---

2. To correspond to the charge-off from the assets account, the FCA charged off $8,504,287 from the undistributed earnings account, leaving a figure of minus $7,559,350. When that figure was applied to the surplus reserved of $6,513,701, it resulted in the impairment of $1,045,649. (*See* "Statement of Condition as of June 30, 1983," Edwards Affidavit, Exhibit VII, p. 3.)

3. The FICB's "Analysis of PCA Budget and Financial Planning" for the Association, dated February, 1983, projected a peak ratio of debt-to-capital of 6.0 to 1 in 1983, 5.5 to 1 in 1984, and 5.0 to 1 in 1985. (Affidavit of Gregory T. Williams (Nov. 1, 1983), p. 6.)

amounts. Such a review would be inappropriate.

A court can play a significant role in refereeing administrative actions even in the specialized field of financial regulation. *Cf. Greene County National Farm Loan Ass'n v. Federal Land Bank*, 152 F.2d 215, 220 (6th Cir.1945), *cert. denied*, 328 U.S. 834, 66 S.Ct. 978, 90 L.Ed. 1610 (1945). However, its role is limited. Congress has conferred on the Farm Credit Administration the specialized responsibility of insuring the fiscal integrity of the Farm Credit System. *See* 12 U.S.C. § 2252. If the FCA carries out its responsibilities with integrity, no court will substitute its judgment for that of the agency. My authority is limited to determining whether the FCA's actions (1) violated its own regulations or (2) were arbitrary and capricious. *See Good Samaritan Hospital v. Mathews*, 609 F.2d 949, 951 (9th Cir.1979).

## II. *Success On The Merits.*

The first question is whether plaintiffs have raised sufficiently serious legal questions to establish fair grounds for litigation. *Cf. Aleknagik Natives Ltd. v. Andrus*, 648 F.2d 496, 502 (9th Cir.1980). The most serious question is whether the FCA followed proper procedures in its June 30, 1983 special audit of the Association. As a result of that audit, the FCA charged off $8.5 million in loans. This figure represents the total losses FCA anticipates the Association will experience if it attempts now to recover those loans.

Plaintiffs contend the FCA auditors acted arbitrarily in making many of the individual calculations underlying their ultimate decisions to classify forty-three loans as "loss loans" and recommending substan-

tial charge-offs. Plaintiffs also contend the FCA violated its own regulations in performing the special audit. I conclude plaintiffs are likely to prevail in the litigation.

### A. *Introduction.*

Loans of a production credit association are required to be classified as "acceptable," "problem," "vulnerable," or "loss." 12 C.F.R. § 614.4051.[4] If a loan is classified as "loss," some portion of that loan may be charged off the Association's books, reflecting a judgment that the Association is unlikely to collect that amount.

Classifying a loan as a "loss" loan, however, does not *ipso facto* result in any actual loss of income for the Association. Borrowers do not know how the Association classifies their loans or whether it has charged off any of the loan amount. They make their periodic payments to the best of their ability. That ability can exceed the expectations of an auditor. The Association itself has classified numerous loans as loss loans in the past several years due to the serious agricultural recession in the Willamette Valley.[5] One of the FCA auditors told an Association employee in June of this year not to worry about the substantial reclassifications contemplated by the special audit because when collections exceed projections, the Association will look good. (Affidavit of Gregory E. Pilcher, p. 9.)

Loan loss charge-offs are accounted as a current year expense. During 1982, loan losses exceeded the Association's existing reserve, plus a normal annual addition, by $3,845,799. (Affidavit of Larry K. Butter-

---

**4.** Loans not classified as "acceptable" are regarded as "adverse."

**5.** The Willamette Valley is in the midst of a severe agricultural recession. Net farm income has been depressed for the last three years due to low commodity prices and rising production costs. (Affidavit of A. Gene Nelson, p. 9.) Oregon farmland values declined five percent in the twelve month period ending April 1, 1983. (*Id.*) Under these circumstances it is important to recall that the Farm Credit Act itself was created to assist farmers during the disastrous economic

conditions of the Great Depression. Congress declared that "a prosperous, productive agriculture is essential to a free nation" and recognized "the growing need for credit in rural areas ...." 12 U.S.C. § 2001(a). Congress stated that a "farmer-owned cooperative Farm Credit System" should "accomplish the objective of improving the income and well-being of American farmers and ranchers by furnishing sound, adequate, and constructive credit and closely related services to them ...." *Id.*

field (Oct. 31, 1983), p. 8.) This loss required the FICB to call upon other PCAs in the Twelfth District to contribute $2,731,-635 to the Association under the District's mutual loss sharing program. Those funds will be repaid to the contributing PCAs if the assets are sold for amounts exceeding the book values. Evaluation of the character and past record of the borrower thus becomes critical in the charge-off determination.

The Association's 1982 annual report indicates a calendar year net income of $972,-060. The FICB challenged this figure, contending that when the mutual loss sharing "subsidy" is subtracted, the Association had a net operating loss of $1,759,575. (*Id.*, p. 2.) There is only such a loss if loan losses are charged against current income. When operating expenses alone are subtracted from income, the Association is not losing money. For 1982, the net income *from operations* was $837,162. (*Id.*, p. 6.)

Classification of a loan as a loss loan has a second effect, one which is independent of the determination of charge-off amounts. On classification of a loan as a loss loan, the Association is precluded from crediting any payments on that loan to interest; all payments are credited to reduction of principal.

Prior to the June 30, 1983 audit, fifteen of the Association's loans were classified "loss." These loans had a total outstanding value of $11.2 million. After the audit, forty-three of the loans were classified "loss" and these loans have a total value of $22.6 million. The reclassification results in an additional "book" loss of current income to the Association of more than $1 million. (*See* Transcript (Oct. 19), pp. 142–43 (testimony of Virgil Elkinton).) As previously noted, however, there is a real loss of income only if those loans, with accrued interest, are not eventually paid off.

The parties agreed that the FCA's audit procedures could be adequately illuminated by an examination of just five loans. The special audit reviewed 239 loans and it would have been logistically impossible, as well as judicially ill-advised, to examine all loans reviewed. Plaintiffs argue that just on the five loans examined, improper charge-offs exceed $4.5 million. (Plaintiffs' Summary of Various Discrepancies, p. 6.) They contend that an adjustment of only $1.1 million in the FCA's figures would eliminate the claimed impairment and ratio imbalance. Because of the significance of the revaluations to the continued existence of the Association, it is appropriate to determine whether there is a reasonable basis for believing that the FCA probably violated its regulations or acted arbitrarily and capriciously in performing the special audit.

B. *Valuation of Real Estate Collateral.*

FCA regulations require that "[p]rimary real estate security shall be valued on the basis of appraised value . . . ." 12 C.F.R. § 614.4220(a). "Appraised value . . . is the reasonably supported market value. Market value is defined as the amount which a property will bring if a reasonable time is allowed to find a purchaser . . . ." 12 C.F.R. § 614.4220(b).

Plaintiffs contend the FCA did not use market value in its determinations but rather used Association values which represented recovery value, and then arbitrarily subtracted an additional twenty-five percent for carrying charges and selling costs. There is considerable evidence to support those contentions.

Fred Boyer, past president of the Association, testified that recovery values were used in the Association to value both primary and secondary security. (Affidavit of Fred Boyer (Oct. 31, 1983).) Recovery value "is the amount, less estimated maintenance, selling costs, [and] all prior liens and encumbrances . . . which the lender should be able to realize from sale of property on reasonable terms." 12 C.F.R. § 614.-4220(c). Boyer stated recovery values were determined by taking the fair market value of a piece of property and subtracting carrying costs for one year (including taxes) and selling costs. He characterized the values used as a very conservative esti-

mate of the net realizable value if liquidation was effectuated over a short period of time.

There is no documentation in the record of any serious effort made by the FCA to determine fair market value of real property. Not only were no organized work papers or comparable sales data offered into evidence, there were no auditors' notes of conversations or comparable sales figures. Paul Rauch, FCA's reviewer in charge of the special audit, so testified.

During the course of the numerous hearings held, I repeatedly asked for copies of any internal regulations or manuals containing FCA policies and procedures for auditing. I was repeatedly assured that nothing of the sort existed, apart from the published regulations and generally accepted accounting procedures. This statement was made despite the reference in Mr. Edwards' second affidavit to the "Systemwide PCA [sic?] Accounting Manual." (Edwards Affidavit (Oct. 13, 1983) ¶ 25.) Finally, *after* I granted a preliminary injunction, the FCA submitted excerpts from a manual entitled "Examination Objectives and Procedures" which the FCA's acting Governor declares is used by the FCA "in conducting examinations of the Farm Credit System institutions, including the production credit associations." (Excerpt of Farm Credit Administration Manual (Oct. 28, 1983).) The heading on each page of the excerpt is "Examination Program for Federal Intermediate Credit Banks." I accept the acting Governor's declaration, however, that these are the procedures the FCA has decided to follow in auditing production credit associations.[6]

Section 245–50 of the "Examination Objectives and Procedures" states that "[i]n accordance with general examination routines ... examiners should direct their effort toward documenting and assembling the information obtained in such a manner that their findings and determinations can

readily be formed into bases for discussion ...." (*Id.*, p. 32.) The FCA's own manual, then, declares the necessity for documentation of collateral values.

Plaintiffs' expert accountant reviewed the loan documents for the five loans (plaintiffs' exhibit 1) and the papers available in the Association files in light of the applicable regulations. He stated that "it is impossible for me, as a certified public accountant, to determine how the FCA auditors arrived at the values of these assets during their June, 1983 audit." (Supplemental Affidavit of Virgil Elkinton, p. 2.)

Plaintiffs' accountant further stated that regulatory audits such as this one should be reconciled with generally accepted accounting principles so that agencies know both the regulatory impact and the economic essence of a transaction. (Affidavit of Virgil Elkinton, p. 2.) He indicated the proper way to evaluate loans on a true economic basis is to "individually analyze each loan, looking at the nature of all assets pledged to collateralize the loan including personal guarantees and nonbusiness assets of the borrower which may be available for repayment." (*Id.*, p. 3.) Based on his review of the five loans, including all documentation made in the course of the June 30 audit, he concluded that none of the loans should be placed in a loss loan category or have the charge-offs recommended. (Supplemental Affidavit of Virgil Elkinton, p. 2.)

The FCA was offered the opportunity to rebut the evidence presented that in many instances the FCA used recovery values determined by the Association as the starting place for the auditors' review but failed to do so. In every case they further reduced the starting values by twenty-five percent to cover the costs of holding and liquidation. Where they started with recovery values, those costs were already deducted, resulting in a double charge-off.

---

**6.** The dates at the bottom of the pages excerpted add credence to the assumption these procedures apply System-wide. Each of the pages has the date either of October 1, 1974 or September 15, 1975, presumably indicating the date of adoption of the procedure explained on that page. If the procedures have been in place for nearly a decade, it is reasonable to assume their application has become System-wide.

The FCA violated 12 C.F.R. §§ 614.4220(a), (b).

There is a further problem. The FCA identified no specific regulation or written agency policy providing for valuing the real estate collateral of adversely classified loans at recovery value (fair market value minus twenty-five percent) rather than the market value required by section 614.-4220(b). The "Examination Objectives and Procedures" manual states that "[i]n instances where the line of credit is directly dependent on the real estate, it is essential that the collateral value be estimated at a dependable and realistic amount which could be expected under distressed sale conditions." (Excerpts of Farm Credit Administration Manual, p. 31.) The provision of the manual seems to conflict with the plain wording of the regulation.

Even if there is some basis for FCA valuations of real estate collateral at recovery value, the agency violated its regulations in determining recovery values. Recovery value is defined as

a modification of present market value as determined by a loan analyst or appraiser and lies between present market value and a forced sale value. Condition of the loan and of the farming operation, and the circumstances under which recovery would be likely to be attempted will need to be recognized in determining such value .... Values based on security in appraisal or inspection reports should clearly define the basis on which the value was established.

12 C.F.R. § 614.4220(c). In three respects, the FCA audit failed to meet the requirements of this section.

First, to the extent the FCA used Association recovery values for the special audit's fair market values and then reduced those figures by twenty-five percent, the FCA's determinations for "recovery" values were at or below "forced sale value," in violation of the regulation.

Second, the regulation requires (1) recognition of the "[c]ondition of the loan and of the farming operation" and (2) "the circumstances under which recovery would likely be attempted ...." *Id.* There is a woeful lack of evidence that FCA examiners recognized any realistic conditions or circumstances. This regulation further prescribes that recovery value "should be predicated on the basis of the active effort to dispose of the property when related to a workout loan situation." *Id.* The evidence is that Oregon farm values have been depressed over the past few years and that quick liquidation of real property in the present market will result in a lower recovery for the Association, than will orderly liquidation through a workout loan situation.

Third, the special audit does not "clearly define the basis" on which recovery values were established. *Id.* The audit does not define the basis at all.

C. *Consideration of Other Credit Factors.*

Collateral offered or available for security is only one of a number of factors which the FCA and FICB are required to consider in evaluating the soundness of a loan. Section 614.4150 specifies four other basic factors to be considered as well. These are the borrower's character, financial position and progress, repayment capacity, and basis of approval. 12 C.F.R. · § 614.4150. (*See* Excerpts of Farm Credit Administration Manual, p. 21.)

The FCA's failure to consider the character of the borrowers in the five loans examined was attested to by Paul Rauch, the chief reviewer. He stated that the FCA auditors did not evaluate the character of any of the people involved in the five loans but simply assumed that "these men were doing their best to pay their debts." (Transcript, p. 260.) FCA's counsel misstated that assumption when he declared Rauch had testified that the auditors assumed all borrowers had good character. (Transcript, p. 326.)

The FCA regulation declares:

A prerequisite for a sound loan is an applicant of established integrity. Responsible and cooperative management must be evident. *The importance of*

*this factor is of such significance that it can affect the weight placed upon the other credit factors.* Analysis shall include a careful evaluation of character
. . . .

12 C.F.R. § 614.4150(a) (emphasis added).

It is clear that a serious flaw in the FCA's special audit was its disregard of the character and integrity of these borrowers. The importance of this factor can perhaps be illustrated by reference to the loss record of the Association prior to the difficult economic conditions of recent years. For more than four decades, from its incorporation in 1934 through the end of 1978, the Association advanced a total of nearly $600 million. Yet in that period, the *cumulative* losses for the Association were under $500,000, or less than one-tenth of one percent of loans advanced. (Edwards Affidavit, Exhibit II.) In short, the great majority of these borrowers repay their debts. Character is particularly significant in unusual and hard economic times.

Section 614.4150(c) states that the determination of the borrower's repayment capacity "requires an analysis of case flow history and projection." 12 C.F.R. § 614.-4150(c). The FCA recognizes that the borrower's repayment capacity is one factor which must be considered in determining whether a loan is collectible. (Edwards Affidavit, ¶ 25.) Yet, there is no documentation in the record that such analysis occurred during the special audit. Perhaps this is not surprising in light of the complete lack of documentation even of fair market value of real estate collateral. I cannot conclude at this point that the analysis required by section 614.4150(c) was performed for any loan.

The FCA also used questionable procedures in valuing security such as accounts receivable and inventory. For example, in sample Loan # 1, the FCA reduced inventory by $600,000. The basis for this reduction is undocumented. The auditor explained simply that accounts were not "aged." He made no analysis and was unaware of what aging should occur in the particular business. In Loan # 2, the FCA wrote off approximately $929,000 from accounts receivable and inventory, again without documentation. In Loan # 3, no value was given to growing crops. The crop consisted of Christmas trees worth approximately $15,000.

Gregory Pilcher, the former vice president of the Association, stated that farm equipment had already been discounted by the Association ten to fifty percent from market value before the FCA's calculations; that he was not aware that the FCA auditor gave any consideration to borrowers' personal assets not secured by specific security instruments; that the auditors did not consider other sources for repayment such as professional income or wages; that cash, certificates of deposit, cash value life insurance, personal property, and livestock and crops in which the Association did not have a security interest, were all ignored by the FCA auditors; and that little or no value was given for patronage dividends, reserves and stock in cooperatives. (Affidavit of Gregory E. Pilcher, pp. 3–4.) There is no substantial evidence to contradict these statements.

In short, there is substantial evidence that the FCA did not adhere to its own auditing regulations when it classified an additional twenty-eight loans down to the loss category and recommended charge-offs of over $8 million.

### D. *Consultation.*

The June 30, 1983 special audit differed dramatically from previous, regularly scheduled audits in the degree of consultation and communication between FCA examiners and Association personnel. In past audits, problem loans were fully discussed and all parties generally came to an agreement on proper classifications. In this audit, there was no meaningful consultation between the FCA and this Association's officers or employees. In the consultation which did occur, the "give-and-take" of prior audits was absent. The FCA determined the values and told the Association's staff what they were. Rauch's testimony to the contrary was unpersuasive.

Although a higher than usual level of confidentiality was perhaps appropriate in the special audit, there is substantial evidence to support a conclusion that the FCA arbitrarily determined substantial loss values and effectively imposed their conclusions on the Association's staff. As plaintiffs' expert accountant put it, "[i]t is entirely inappropriate for an auditor or regulatory body to make arbitrary conclusions about loan losses of accounts and then fail to make workpapers indicating reasoning and documentation available to those directors who are charged with the responsibility of managing the association." (Affidavit of Virgil Elkinton, p. 4.)

### E. *Conclusion.*

Based on my initial evaluation of the evidence presented and the applicable law, I conclude plaintiffs are likely to prevail in this litigation.

If at trial I finally conclude the audit should be invalidated, then the August 10, 1983 Order of the Governor of the FCA finding an impairment of the capital stock of the Association and suspending the Association's directors and bylaws would be set aside. It was based directly on the results of the special audit.

### III. *Balance Of Hardships.*

On granting the temporary restraining order I stated:

The balance of hardships tips sharply in favor of the plaintiffs. Liquidation of the Association will leave agricultural borrowers without an alternate source of credit at a critical time, considering the economy of the area. I do not believe that other production credit associations will be able to meet the credit needs of the agricultural borrowers in this area. There is reason to believe that borrowers may be forced to sell collateral in order to repay loans. Forced sales in this depressed economy will severely penalize those borrowers. The effect of numerous sales and foreclosures will be a further erosion of agricultural values affecting farmers generally in the Willamette Valley.

Appendix II, op. at 267. I went on to indicate that "[t]here is no discernable hardship to defendants if liquidation is postponed until the Association's financial position can be accurately evaluated." *Id.*, op. at 267. I also discerned a "strong public interest" in restraining liquidation of the Association. *Id.*

In the past few weeks, the respective hardships have become more clear. The defendants have moved for a stay of the preliminary injunction pending appeal to the Ninth Circuit. The effect of my granting the stay, or of the Ninth Circuit overturning the preliminary injunction, would be that "[f]ederal defendants will appoint a receiver for the Willamette Production Credit Association and this receiver will commence liquidation," Motion for Stay Pending Appeal, p. 2. They offer no interim solution. Therefore, I treat the motion for stay as a motion to reconsider the order granting the preliminary injunction. Defendants make several arguments.

First, defendants argue that each day the receivership is delayed creates the potential for financial losses for the FICB and for the borrowers of the Association and of other production credit associations in the Twelfth Farm Credit district. *Id.* The FICB argues that when it suffers losses on its direct loans to the Association, "it must charge those losses against its reserves which can then only be replenished by charging higher interest rates to all Production Credit Associations in the district." *Id.*

The FICB has not presented any evidence of the extent of possible losses to the FICB and to sister production credit associations between now and the trial on November 23rd. I cannot conclude that the short delay contemplated will work any hardship to defendants, particularly where the alleged losses are based on revaluations of security and not on operating losses.

Second, defendants contend that the farmers and ranchers who have borrowed from the Association will not receive dis-

bursements of previously committed loan funds and that there will be no funds to disburse in the absence of a receiver. Motion for Stay Pending Appeal, p. 2.

After the August 10, 1983 order invoking the "section 1140 procedures," but before I issued a temporary restraining order on October 7, the Association's borrowers were receiving disbursements of previously committed loan funds. Upon my issuance of the TRO, the defendants abruptly cut off those funds.[7]

Daily disbursements of the Association range from $150,000 to $500,000.

Little evidence has been offered as to the loan needs of various borrowers from October 7 to November 23 and how those needs are being, or might be, met. In the absence of any affidavits by borrowers who may have been left stranded, or any other pertinent evidence, I cannot conclude that significant numbers of Association borrowers are finding it impossible to obtain necessary funds elsewhere, or will suffer hardship in the three more weeks until trial.

Third, defendants state the Association is currently experiencing operating losses and that continuation of the preliminary injunction will cause these losses to continue accruing. *Id.*, p. 3. Defendants have stated that the Association is losing funds at a rate of approximately $30,000 per week. They have offered no evidence to support this assertion, except for a conclusory statement by Edwards. (Edwards Affidavit, ¶ 43.) This may be a paper loss only. (Affidavit of Virgil Elkinton, pp. 3–4.)

As discussed *supra*, op. at 268–269, the categorization of $22 million in loans as loss loans causes the Association to be unable to consider interest payments on those loans as current income; rather, all on-going payments are credited against principal. I have preliminarily declared the June 30, 1983 special audit without effect, however, and the interest portion of loan payments on loans not classified as loss loans prior to the June 30 audit may now be

considered current income. The 1982 Annual Report of the Association showed an *operating* profit of nearly $1,000,000. I cannot conclude defendants will suffer any hardship by reason of asserted operating losses if this preliminary injunction is not dissolved before trial on November 23.

Fourth, defendants argue that eighty to eighty-five percent of the Association's borrowers will be benefitted by the immediate appointment of a receiver because of their stock ownership in the Association. (Motion for Stay Pending Appeal, p. 3.) This argument is based on the assumption that the Central Oregon Production Credit Association ("COPCA") will immediately purchase that fraction of the Association's outstanding loans thereby stabilizing the value of the stock.

I recognize COPCA as a well-managed production credit association. Specifically, I acknowledge, as do plaintiffs, the competence of Mr. William Hitson, COPCA's president. However, the differences in agricultural methods between the Willamette Valley and the territory served by COPCA are so great that I cannot accept that Willamette Valley farmers can be adequately served by a PCA headquartered on the other side of the Cascade Range. It is likely that many current borrowers and potential borrowers of the Association could not avail themselves of COPCA's services, thus causing an increased demand on other agricultural credit sources.

In any event, COPCA is obligated only to purchase "acceptable" or "problem" loans, and is not obliged to purchase all of those. "Good" borrowers do not necessarily need another PCA to step in. They may well obtain commercial financing from other sources. It is the borrowers hardest hit by the recession who are most in need of the continuation of the Association as a viable enterprise. For these borrowers, defendants offer only liquidation.

---

**7.** Defendants' sudden cut-off of previously committed loan funds partakes of an inexcusable (and unsuccessful) effort to coerce the court into approving an improper audit by threatening hardship to individual farmers.

In addition, there is no assurance that the great majority of the Association's stockholder-borrowers would benefit from liquidation, as defendants contend. Rather, with liquidation, all stockholders of the Association are likely to lose their equity investments. Pilcher, former vice president of the Association, stated that the FCA-appointed Association president, Greg Williams, stated to him that liquidation will result in no value to the class B stockholders. Pilcher, himself, believes liquidation would result in a complete loss of equity. (Affidavit of Gregory E. Pilcher, p. 12.) The book value of the class B stock held by the Association's eleven hundred shareholders as of June 30, 1983 was just over $10,000,000. (Edwards Affidavit, Exhibit VII, p. 3.) If the Association survives, borrowers may be able to salvage their equity, ultimately converting their stock to cash. Significantly, no member of the Association has stepped forward to support defendants' arguments even though extensive publicity has been given this matter since plaintiffs filed their complaint on September 22, 1983.

Fifth, the FICB contends that in the absence of appointment of a receiver, it will be required to seek alternate remedies under law to protect its position as the principal creditor of the Association. I will discuss the "default issue" *infra*, op. at 275–276.

Sixth, defendants argue that continued operation of the Association by the plaintiffs as directors poses the threat of a "run" on Association capital. (*Cf.* Statement of Larry K. Butterfield, ¶ 5.) Presumably, a borrower could turn elsewhere for funds and, upon repaying his Association loan, redeem his stock.

Defendants have presented no evidence that any such run is occurring or is about to occur. They have their own employees on the scene as observers who have full access to all information and transactions. If any evidence of a real threat of a run is brought to my attention, I will immediately consider an application for appropriate relief.

A run could only occur if the directors revoked the resolution they passed on October 29, 1983. Recognizing that there has not been a final determination as to whether the stock of the Association is impaired, they decided the Association would not, on its own, redeem any stock. All requests for redemption will be forwarded to the FICB for evaluation. Thus, the capital stock of the Association will not be depleted prior to the November 23rd trial.

IV. *Irreparable Harm.*

As I stated when granting the temporary restraining order,

> Liquidation of a corporation is irreparable injury satisfying the preliminary injunction standards. If the FCA audit was erroneously performed and the FCA is allowed to immediately liquidate the Association based on that audit, the harm to shareholders and borrowers, Willamette Valley farmers, as well as the citizens of Oregon generally, will not be compensable at a later date.

Appendix II, op. at 9. Plaintiffs and the members of the Association are faced with the loss of their equity investment of approximately $10,000,000 as well as their lending institution. They have relied on the Association in their farming operations for forty-eight years. Liquidation would occur at a time when there is already a significant diminution of the supply of available credit for agricultural production.

Most Willamette Valley agricultural production is through family farming. The success or failure of one generation of agricultural producers in maintaining or improving the family farm enterprise has a profound effect on the next generation's ability to do so. (Affidavit of Ray Hobson, p. 2.) For years the slogan of the Association has been "a dependable source of credit for dependable farmers." If that source of credit is lost through precipitous action based on a faulty audit, it may be a full generation before the production credit system in the Willamette Valley attains the level of confidence it has enjoyed the past four decades. (Affidavit of Philip M. Brandt, p. 8.)

## V. *"Default Issue."*

On October 26, 1983, I issued a preliminary injunction which, among other things, set aside the August 10, 1983 Order of the Governor of the FCA finding the capital stock of the Association impaired. (Appendix I.) Until October 25, 1983, my temporary restraining order first issued October 5th had prevented the FCA from appointing a receiver and liquidating the Association. (Appendix II.) At a hearing on November 1st, counsel for the FCA asked whether the FCA could now appoint a receiver and commence liquidation. I advised him it could not. The FCA assumed there could be a basis for receivership in the fact that the preliminary injunction does not contain the same prohibitory language as did the temporary restraining order.

The August 10th FCA Order was issued pursuant to 12 C.F.R. § 611.1140 only. Subsequent to the commencement of this litigation, the FICB wrote a letter to the Association calling its loan. The FCA contends that receivership is authorized by 12 C.F.R. § 611.1130 in that the Association is in default on its obligations to the FICB.

The first affidavit of Larry W. Edwards, FCA's deputy governor for the Office of Supervision, indicated the Association's loan from the FICB exceeded the amount permitted under its loan agreement by $47.7 million. (Edwards Affidavit, ¶ 3.) Edwards also stated the loan was in excess of the amount permitted by FCA regulations by $24.1 million but that special approval to exceed the permitted amount had been given. (*Id.*) There is no evidence, however, that the Association is behind in its payments on the additional amount.

Section 611.1130 provides that

upon default of any obligation by any association which cannot be corrected by other action including but not limited to mergers, the Governor may declare an association insolvent and place it in the hands of a receiver . . . .

12 C.F.R. § 611.1130. *See* 12 U.S.C. § 2183(b).

The August 10, 1983 FCA Order makes it clear that institution of protective procedures was based on a finding of impairment of capital stock resulting from the June 30 audit. There is no reference in that Order to a default. In addition, Edwards's thorough affidavit of October 3, 1983 does not state that liquidation is contemplated *because of a default.* (*Cf.* Edwards Affidavit, ¶¶ 31, 51.)

There is no evidence in the record from which I can conclude the Association is in default on its obligation to the FICB. While plaintiffs have stipulated the Association is in default, it appears that the default occurs from the valuations questioned in the June 30, 1983 special audit.

The FICB's letter declaring the Association in default and calling the loan as of October 7, 1983, stated three grounds for the default: first, the Association is in "direct loan deficit" with the FICB; second, the Association's debt-to-capital ratio exceeds 10 to 1; and third, the class B stock is impaired. (Letter of Sept. 30, 1983 from Larry Butterfield to Association president, Edwards Affidavit, Exhibit XVII.) I have already dealt with the latter two grounds. I have concluded that a properly performed audit would probably resolve the issues of ratio and impairment. More troubling is the "direct loan deficit" contention of the FICB. That issue has not been fully presented and argued. While I believe that proper valuations of underlying securities will resolve that contention, I am deferring ruling on the defendants' motion to stay pending further hearing and argument at 9:00 a.m. on Wednesday, November 9, 1983.

## CONCLUSION

Based on the evidence offered, I conclude plaintiffs have met Ninth Circuit standards for issuance of a preliminary injunction. They have demonstrated both probable success on the merits and the possibility of irreparable injury, and that serious questions are raised and the balance of hardships tips sharply in their favor. *Los Angeles Memorial Coliseum Commission v.*

*National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980).

I have issued an amended preliminary injunction this date providing therein, and subject to further order of this Court, that:

1. The FCA and its Governor, Donald Wilkinson, are enjoined from appointing a receiver for the Association or commencing liquidation.

2. The Farm Credit Administration's June 30, 1983 special audit has no effect.

3. The August 10, 1983 Order of the Governor of the FCA, 48 F.R. 39,291–92 (Aug. 30, 1983), has no effect.

4. Defendants, and each of them, are enjoined from soliciting, encouraging, or assisting any Association borrower to transfer to the Central Oregon Production Credit Association.

5. Plaintiffs are reinstated as Directors of the Association; the Association's By-laws are reinstated; and there is no finding that the Association's capital stock is impaired. or that its debt-to-capital ratio exceeds 10.0 to 1. The status quo is restored as of August 9, 1983.

Plaintiffs have posted a bond in the amount of $25,000, as previously required.

## APPENDIX I

### ORDER GRANTING PRELIMINARY INJUNCTION

PANNER, District Judge.

The temporary restraining order last issued in this case expired at midnight on October 25, 1983, and no further extensions are authorized. *See* Fed.R.Civ.P. 65(b). Plaintiffs have raised serious legal questions concerning the June 30, 1983 special audit performed by the Farm Credit Administration. They have demonstrated the balance of hardships tips sharply in their favor. A firm trial date of November 23, 1983 has been established and the court is committed to rendering a prompt decision thereafter.

The motion for preliminary injunction is granted. Pending the decision of this case on its merits,

IT IS HEREBY ORDERED:

1. The Farm Credit Administration's June 30, 1983 special audit is null and void.

2. The August 10, 1983 Order of the Governor of the FCA, 48 F.R. 39,291–92 (Aug. 30, 1983), is set aside.

3. Defendants, and each of them, are enjoined from soliciting, encouraging, or assisting any WPCA borrower to transfer to the Central Oregon Production Credit Association.

4. Plaintiffs are reinstated as Directors of the WPCA; the WPCA's Bylaws are reinstated; and there is no finding that WPCA's capital stock is impaired. The status quo is restored as of August 9, 1983.

This injunction will become effective upon the posting of a bond in the amount of $25,000.00.

Defendants have requested that I stay this preliminary injunction pending appeal to the Ninth Circuit. I will schedule a hearing on a stay promptly upon submission by defendants of an appropriate motion with a detailed supporting memorandum.

DATED this 26th day of October, 1983, at 8:30 a.m.

## APPENDIX II

### OPINION AND ORDER

PANNER, District Judge.

Plaintiffs seek injunctive relief restraining defendants from controlling operations of the Willamette Production Credit Association (Association), and reinstating control of the Association in its elected directors. Plaintiffs also seek a Writ of Mandamus ordering the Governor of the Farm Credit Administration (FCA) to invest capital in the Association.

A show cause hearing was held October 5, 1983. Defendants informed the court that liquidation of the Association would take place on October 7, 1983. I issued a

temporary restraining order until October 7, 1983, preventing defendants from liquidating the Association. I now extend the temporary restraining order ten days and set a hearing on the motion for preliminary injunction for Monday, October 17, 1983, at 3:00 P.M.

## BACKGROUND

Plaintiffs are shareholders of the Association, a corporation organized under the Farm Credit Act of 1933, as amended, Pub.L. No. 92–181, 85 Stat. 597, 12 U.S.C. § 2091 (1983). Federal Intermediate Credit Bank of Spokane, Washington (FICB) is the Association's supervising agency. FCA has supervisory authority over the entire Farm Credit System.

In April, 1983, the FICB conducted an audit of the Association in accordance with FCA regulations. That audit revealed Association loan losses in excess of $2,600,000.00.

In June, 1983, the FCA and FICB performed a special audit of the Association and discovered $8,900,000.00 in loan losses. Concluding the Association's stock was impaired, the FCA suspended the bylaws and directors of the Association on August 10, 1983. No criminal misconduct has been attributed to the Association's directors.

The FCA has determined to liquidate the Association. The liquidation is proposed to take place October 7, 1983. Affected farmers will be encouraged to seek credit from neighboring financial institutions. If the liquidation takes place, it will be the first since the Farm Credit Act was enacted in 1933.

Plaintiffs allege that the June, 1983 special audit was conducted in an arbitrary and capricious manner, and in violation of FCA regulations.

## JURISDICTION

This court has jurisdiction to review the actions of the FCA under the Administrative Procedures Act (APA), 5 U.S.C. § 701 *et seq.* (1983). "Regardless whether a statute implies a private right of action, administrative actions thereunder may be challenged under the APA unless they fall within the limited exceptions of that Act." *Glacier Park Foundation v. Watt,* 663 F.2d 882, 885 (9th Cir.1981).

The APA allows exceptions to judicial review if a statute expressly precludes such review or if the agency action was committed to its discretion by law. 5 U.S.C. § 701(a). The exceptions are narrowly construed: "Judicial reviewability of administrative action is the rule and nonreviewability a narrow exception, the existence of which must be clearly demonstrated." *City of Santa Clara, Cal. v. Andrus,* 572 F.2d 660, 666 (9th Cir.1978), *cert. denied,* 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978).

### 1. The Farm Credit Act Does Not Preclude Judicial Review.

Judicial review of FCA actions is not mentioned in the statute. 12 U.S.C. § 2001 *et seq.* (1983). "Mere silence in the statute will not be read as precluding judicial review under the APA. Such review 'shall not be foreclosed unless Congress has forbidden review in unmistakable terms.'" *Sierra Club v. Peterson,* 705 F.2d 1475, 1478–79 (9th Cir.1983). In *Sierra Club,* a citizen's suit provision had been deleted prior to passage of the statute at issue. Despite the deletion, the court found no indication of Congressional intent to prohibit such actions. 705 F.2d at 1479.

Here, defendants failed to show "in unmistakable terms" that Congress intended to forbid judicial review of FCA actions.

### 2. The FCA Action Was Not Committed To Its Discretion By Law.

The exception for actions committed to agency discretion is limited to "those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *City of Santa Clara,* 572 F.2d at 666. Even if an agency has absolute statutory discretion over particular actions, the agency's regulations limit that discretion and provide a source of legal standards for judicial review. *Glacier*

*Park Foundation,* 663 F.2d at 885–86. *See also Johnson Oyster Co., Inc. v. Baldridge,* 704 F.2d 1060, 1062 (9th Cir.1983) (allegations that Secretary of Commerce violated a department regulation stated an issue for judicial review despite Secretary's unreviewable discretion under the statute).

Actions of the FCA are subject to judicial review where violations of agency regulations are alleged. Here, the FCA is alleged to have conducted a special audit in violation of 12 C.F.R. § 614.4220 (1983). That regulation requires loan collateral to be valued at market value or modified market value, both of which are greater than forced sale value. Plaintiffs allege that the FCA valued security at forced sale value. Section 614.4220 provides legal standards by which the court can review the FCA's action.

Neither of the APA exceptions apply to the FCA action here. Judicial review is appropriate.

## STANDARDS

A higher standard must be satisfied when a temporary restraining order is sought ex parte than when the opposing side has notice and appears at the hearing. *Levas and Levas v. Village of Antioch, Ill.,* 684 F.2d 446, 448 (7th Cir.1982). The application for a temporary restraining order will be treated as one for a preliminary injunction where, as here, defendants have been able to present their opposition. *Id.*

A preliminary injunction will issue if the movant demonstrates either (1) probable success on the merits and the possibility of irreparable injury, or (2) serious questions are raised and the balance of hardships tips sharply in the movant's favor. *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1200 (9th Cir.1980). "If the balance of harm tips decidedly toward the plaintiff, the plaintiff need not show as robust a likelihood of success on the merits, although the plaintiff must at a minimum have a fair chance of success on the merits." *Aleknagik Natives Ltd. v. Andrus,* 648 F.2d 496, 502 (9th Cir.1980).

### 1. *Balance Of Hardships.*

The balance of hardships tips sharply in favor of the plaintiffs. Liquidation of the Association will leave agricultural borrowers without an alternate source of credit at a critical time, considering the economy of the area. I do not believe that other production credit associations will be able to meet the credit needs of the agricultural borrowers in this area. There is reason to believe that borrowers may be forced to sell collateral in order to repay loans. Forced sales in this depressed economy will severely penalize those borrowers. The effect of numerous sales and foreclosures will be a further erosion of agricultural values affecting farmers generally in the Willamette Valley.

There is no discernable hardship to defendants if liquidation is postponed until the Association's financial position can be accurately evaluated. All operating decisions are presently made by the FCA. Defendants argue that postponing liquidation will result in hardship to shareholders of the Association. But defendants may not speak for those shareholders in this action. The evidence indicates that the shareholders support the Association and its directors. The shareholders justifiably may be more concerned with protecting their equity in the Association and with ensuring a future source of credit than with the current downturn in stock value.

The court must also consider the public interest as it may be affected by the proposed action. *Los Angeles Memorial Coliseum,* 634 F.2d at 1200. The evidence here suggests a strong public interest in restraining liquidation of the Association. Agriculture is an important part of Oregon's economy and the Willamette Valley is one of Oregon's richest agricultural regions. Farming in the Willamette Valley will be severely affected by liquidation of the Association. Land values and credit sources will be affected. Individual farmers may be penalized with liquidation.

### 2. *Success On The Merits.*

Because the balance of hardships tips decidedly in favor of plaintiffs, they must

show only a "fair chance" of success on the merits. *Aleknagik Natives,* 648 F.2d at 502. If the disputed facts are as plaintiffs contend, there is more than a fair chance of success on the merits. An agency is bound by its regulations and an action taken in violation of such regulations may be void. *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). *See also Glacier Park, supra.* There, the court acknowledged that the Forest Service decision to award park concession contracts was discretionary, but where procedural regulations were not followed the contract was void.

The discrepancy between the April and June, 1983 audits lends support to plaintiffs' allegation that the second audit was not performed in compliance with FCA regulations. Plaintiffs have established a fair chance of success on the merit. At the least, plaintiffs have shown "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Aleknagik Natives,* 648 F.2d at 502.

### 3. *Irreparable Injury.*

Liquidation of a corporation is irreparable injury satisfying the preliminary injunction standards. If the FCA audit was erroneously performed and the FCA is allowed to immediately liquidate the Association based on that audit, the harm to shareholders and borrowers, Willamette Valley farmers, as well as the citizens of Oregon generally, will not be compensable at a later date.

I am satisfied that plaintiffs have met both standards for a preliminary injunction.

### BOND

A plaintiff may be required to post a bond for "payment of such costs and damages as may be incurred" by a defendant from a wrongful restraint. Fed.R.Civ.P. 65(c). A bond is not required if there is no likelihood of harm to the restrained party. *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 538–39 (6th Cir.1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979); *Continental Oil Co. v.*

*Frontier Ref. Co.,* 338 F.2d 780, 782 (10th Cir.1964); *Ferguson v. Tabah,* 288 F.2d 665, 675 (2d Cir.1961); *Urbain v. Knapp Bros. Mfg. Co.,* 217 F.2d 810, 815–16 (6th Cir.1954). *See also Detroit Trust Co. v. Campbell River Timber Co.,* 98 F.2d 389, 393 (9th Cir.1938) (court refused to consider factors other than costs and damages to enjoined party).

Defendants control all operations of the Association. They may take any action to protect their interests, short of liquidating the Association. I am unable to ascertain what damage could accrue to defendants as a result of extending the temporary restraining order. No bond is required.

### CONCLUSION

This court has jurisdiction in this action under the APA. Plaintiffs have carried their burden of showing probable success on the merits and irreparable injury. They have also satisfied the alternate test of raising serious legal questions and showing that the balance of hardships tips in their favor. I GRANT a ten-day extension of the temporary restraining order and DENY defendants' request for a bond. Hearing on the motion for preliminary injunction is set for Monday, October 17, 1983, at 3:00 P.M.

IT IS SO ORDERED.

DATED this 12 day of October, 1983, *nunc pro tunc* to October 7, 1983.